**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| ESTHER NORRIS,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 1:07-CV-139-TLS |
| | ) | |
| RELIANCE STANDARD LIFE | ) | |
| INSURANCE COMPANY and | ) | |
| GIBRALTAR PACKAGING GROUP INC. | ) | |
| EMPLOYEE BENEFIT PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION & ORDER

This matter is before the Court on the parties' cross-motions for summary judgment (DE 11, DE 13). The Plaintiff filed suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, claiming that the Defendants wrongfully terminated her disability benefits. All parties contend that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because the Plaintiff has brought an action to enforce ERISA rights as authorized by 29 U.S.C. § 1132.

For reasons explained below, the Plaintiff's motion must be denied, and the Defendants' motion must be granted.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be

---

[1]  Many of the records submitted by the Defendants list the Plaintiff's name as Esther Morris. She was married in August 2005 and changed her last name to Norris, as is listed in the caption.

granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To determine whether any genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the Court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000).

2

When cross-motions for summary judgment are filed, a court looks to the burden of proof that each party would bear on an issue at trial. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). The court then requires the party bearing the burden on an issue to go beyond the pleadings and affirmatively establish a genuine issue of material fact. *Id.*

Pursuant to local rule, the Court is to assume that the facts claimed by the moving party and supported by admissible evidence are admitted to exist without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence. N.D. Ind. L.R. 56.1(b).

## FACTS

The parties contend that the following facts are material. Gibraltar Packaging Group employed the Plaintiff as a finishing manager from June 24, 1985, to April 5, 2004. She was fifty-five years old when her employment ended due to disability. The company provided its employees with a long term disability benefits plan ("the policy") through Defendant Gibraltar Packaging Group Inc. Employee Benefit Plan ("Gibraltar"). Defendant Reliance Standard Life Insurance ("Reliance Standard") insured the policy, which was paid for entirely by Gibraltar.

The policy "provides income replacement benefits for Total Disability from Sickness or Injury." (DE 14-7 at 3.)

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:
> > (1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
> >       . . . .
> > (2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the

3

> Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

(*Id.* at 12.) The elimination period is "90 consecutive days of Total Disability," and the "Monthly Benefit is an amount equal to 60% of Covered Monthly Earnings." (*Id.* at 9.) The monthly benefit is paid if an insured: "(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability . . . ." (*Id.* at 20.) The policy provides that

> Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties.

(*Id.* at 16.)

The Plaintiff filed a claim for long term disability benefits claiming total disability due to constant pain in her back, legs, hips, and knees on July 19, 2004. (DE 14-6 at 29.) She stated that she first noticed these symptoms in May 2002, and that April 6, 2004, was the first date she was unable to work on a full-time basis. (*Id.*) Her occupation as a finishing manager required duties that were considered "light," meaning: "Lifting, Carrying, Pushing, Pulling 20 lbs. occasionally, frequently up to 10 Lbs., or negligible amount constantly. Can include walking and or standing frequently even though weight is negligible. Can include pushing and or pulling of arm and or leg controls." (DE 14-10 at 13.) One of her treating physicians, Doctor Custodio Garrido, concluded on December 29, 2004, that she was not able to perform the "light" duties of her regular occupation, but that she was able to engage in "sedentary lift," meaning "[e]xerting up to

4

10 pounds of force occasionally, and/or a negligible amount of force frequently," and she was able to either "continuously" or "frequently" sit, reach, use foot controls, drive, grasp, push, pull, engage in fine manipulation, and experience tactile sensation. (DE 14-20 at 3–6.)

On August 10, 2004, Defendant Reliance Standard recommended that the Plaintiff apply for Social Security Disability Insurance Benefits if she believed she had an illness or injury that she expected would prevent her from performing substantial work activity for more than twelve months. (DE 14-4 at 39.) Defendant Reliance Standard determined on November 17, 2004, that the Plaintiff met the policy's definition of Total Disability for her occupation—as opposed to being totally disabled from any occupation—and that she was entitled to a pretax net monthly benefit of $1,379. It informed the Plaintiff:

> Your group policy also stipulates that, in order to be eligible for LTD benefits beyond 24 months, you must be totally disabled from performing the material duties of Any Occupation. "Totally Disabled" and "Total Disability" will generally mean that, as the result of any injury or sickness, an Insured cannot perform the material duties of Any Occupation. "Any Occupation" is one that the Insured's education, training, or experience will reasonably allow. If you continue to meet your group policy's definition of Total Disability, you will reach the 24th month on July 5, 2006. An investigation will begin prior to this date in order to gather the necessary information to determine your continued eligibility for Long Term Disability benefits.

(DE 14-4 at 10–11.)

Following the approval of her claim, the Plaintiff continued to receive medical care for her various ailments, and Defendant Reliance Standard periodically reassessed her claim to ensure that she remained eligible for monthly benefits. At various times, the Plaintiff has been diagnosed with diabetic neuropathy, osteoarthritis, monoclonal gammopathy, fibromyalgia, coronary artery disease, renal cell carcinoma, bilateral carpal tunnel syndrome, chronic mechanical low back pain and sacroiliac joint pain, diffuse myofascial pain, lumbosacral

radiculitis, degenerative disc disease, spondylosis, facet arthropathy, significant obstructive atherosclerotic disease, diverticulitis, focal spurring in right shoulder, and moderate degenerative changes in her right hand.

Doctor Garrido completed an Attending Physician's Statement Supplementary Report for Continued Long Term Disability Benefits on April 8, 2005. (DE 14-19 at 22–24.) He noted that he had met with the Plaintiff that day and that she was capable of sedentary activity. (*Id.* at 23.) Specifically, she was capable of "frequently" sitting, using foot controls, driving, grasping, reaching, fine manipulation, and tactile sensation. (*Id.* at 23–24.)

On August 27, 2005, the Social Security Administration determined that the Plaintiff became disabled under its rules on April 5, 2004, and would be entitled to monthly disability benefits ($1,105 per month) beginning October 2004. (DE 14-10 at 3.)

Defendant Reliance Standard sent the Plaintiff a letter on February 6, 2006, informing her:

> In order to be eligible for Long Term Disability beyond 24 months you must be Totally Disabled from performing the material duties of "any occupation."
> Since you first became entitled to benefits on 7-5-04, you will have received 24 months of benefits with our payment to you to 7-5-2006. As of this date the group policy requires that you be disabled from performing the material duties of any occupation given your medical condition and vocational background.
> We are reviewing your claim because of the change in the definition of disability. To determine if you remain eligible for continued benefits, we must evaluate your ability to perform another occupation.

(DE 14-3 at 30.)

On June 8, 2006, laboratory tests ordered by Doctor Farnsworth indicated that the Plaintiff had high cholesterol and high triglycerides. (DE 14-11 at 15.) Doctor Farnsworth noted on July 24, 2006, that the Plaintiff complained of sleeping poorly, experienced difficulty

standing and walking, "matched tender points," had "weakness in hands," and had arthritis and swollen joints in her hands, wrists, right shoulder, both hips, and lower back. (DE 14-10 at 43–44.) He diagnosed her with fibromyalgia and peripheral neuropathy on July 24, 2006. (DE 14-10 at 43–44.)

Defendant Reliance Standard wrote to the Plaintiff on July 14, 2006, informing her that it had determined that she was not totally disabled as defined in the policy because she was capable of performing work for which she was suited by education, training, or experience. (DE 14-3 at 8.) Defendant Reliance Standard stated that it had reviewed the medical records received from Doctor Ramani (through March 27, 2006) and Doctor Farnsworth (through June 13, 2006), reviewed the medical records submitted by the Plaintiff's other doctors, performed its own medical review of the Plaintiff's records, conducted a Residual Employability Analysis, and concluded that "[t]he records support that while your physical limitations would prevent a return to work in your normal occupation, you appear capable of working full time in sedentary occupations." (DE 14-3 at 11.) The letter referred to the U.S. Department of Labor's Dictionary of Occupational Titles for defining "sedentary occupations" as those that require:

> Exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(DE 14-3 at 11.) Particular weight was given in the analysis to Doctor Garrido's Supplementary Report for Continued Long Term Disability Benefits on April 8, 2005, (DE 14-19 at 23–24), in which he reported that the Plaintiff was capable of sedentary activity. (Defs.' Statement of Facts ¶ 19, DE 14.)

In order to determine if there were sedentary occupations appropriate for the Plaintiff's medical condition, vocational background, education and training, Defendant Reliance Standard relied on vocational evaluations from December 13, 2004, and February 21, 2005, completed by Rehabilitation Consultant Jan Levine, which concluded that the Plaintiff had "transferable skills in the packaging production and the supervision and coordination of workers engaged in these activities," and therefore was "able to perform the duties associated with at least 5 alternative sedentary occupations, including denture waxer, glass grinder, solderer, lock assembler, and driller of optical goods." (Defs.' Statement of Facts ¶¶ 22–24, DE 14.)

Defendant Reliance Standard also enclosed a disability benefit payment for the period to August 5, 2006. This was not required under the policy (assuming for a moment that the ineligibility determination was not arbitrary or capricious), but Defendant Reliance Standard represented that it was releasing the payment in good faith to assist the Plaintiff during her search for employment. (*Id.*) The Plaintiff was given 180 days to request a review of the determination.

Doctor James Stevens administered nerve conduction studies on August 3, 2006, which revealed a "slowing of the median palmar conduction velocities bilaterally with also mild slowing of the ulnar finger-to-wrist conduction velocity on the right." (DE 14-11 at 19.) Doctor Stevens wrote in his report that "[t]his is an abnormal study with electrical and clinical evidence suggestive of a very mild carpal tunnel syndrome bilaterally. The patient also appeared to have pain on palpation over her joints suggestive of an underlying arthritic condition contributing to her discomfort." (DE 14-11 at 20.) Doctor John Kim reviewed two chest x-rays on October 17, 2006, and listed three impressions: (1) chronic obstructive pulmonary disease ("COPD"); (2)

chronic granulomatous type calcifications bilaterally; and (3) no active disease or underlying COPD changes. (DE 14-12 at 10.)

A five millimeter cancerous cyst was discovered on the Plaintiff's kidney on October 22, 2006, and she was diagnosed with renal cell carcinoma. (DE 14-13 at 8.) Doctor Erik Weise removed the cyst on December 19, 2006. (DE 14-13 at 3.) Doctor Carl Wrobleski performed a colonoscopy with a biopsy on October 25, 2006, and diagnosed the Plaintiff with moderately severe sigmoid diverticulosis with evidence of active diverticulitis with moderate to marked edema. (DE 14-11 at 3.) Doctor Prasad Nalamolu reviewed nuclear imaging reports on November 1, 2006, and found that the Plaintiff had an abnormal EKG. (DE 14-11 at 28.) He also noted that there was "probably normal perfusion, " a "low likelihood for ischemia," "no segmental wall motion abnormality," and "no significant change" from a prior cardiolite scan performed on February 10, 2006. (*Id.*) The same day, a plethysmograph report showed "a mild obstructive lung defect." (*Id.* at 30.)

The Plaintiff administratively appealed Defendant Reliance Standard's decision on November 29, 2006. Doctor Farnsworth wrote a letter on January 8, 2007, addressed to the Plaintiff, regarding her disability status. He wrote:

> I have been your primary care physician since September 2004 and am writing in support of your claim for total disability. Your current active diagnoses include: (1) diabetes mellitus type 2; (2) diabetic neuropathy; (3) bilateral carpal tunnel syndrome; (4) osteoarthritis; (5) monoclonal gammopathy of uncertain significance; (6) fibromyalgia; (7) hypertension; (8) coronary artery disease; (9) renal cell carcinoma; (10) chronic back pain. You also are in the process of being worked up for an elevated erythrocyte sedimentation rate which may relate to an inflammatory arthritis, vasculitis, or chronic infection.
> As a result of your symptoms, you have chronic pain involving your lower back, your neck and both of your hands. During your recent office visit, I documented markedly reduced grip strength and interosseous muscle strength in both hands, consistent with your carpal tunnel syndrome and peripheral neuropathy. In my

opinion, you would not be able to perform a sedentary job in which you were required to use your hands repetitively even for light duties without undue fatigue and pain. You have been tried on various medications for pain, including medications for neuropathic pain without relief. You have also tried wearing a wrist splint without significant improvement.

Also, since your partial left nephrectomy in December, you have been experiencing increased abdominal pain and difficulty walking. Abdominal and pelvic CT scans have been unremarkable, but laboratory studies demonstrate a markedly elevated erythrocyte sedimentation rate of 77. I do not believe that this is related to your monoclonal gammopathy, as your sed rate was normal in the recent past and I have refrained from treating you for an inflammatory arthralgia or vasculitis until infection has been ruled out. Until your diagnosis is established and your pain is under better control, you will not be able to engage in any meaningful occupation.

(DE 14-12 at 32–33.)

As part of the review process, Defendant Reliance Standard requested that Affiliated Medical Review's IME management services refer the Plaintiff's medical records to another physician for peer review. (DE 14-10 at 22.) Affiliated Medical Review then referred the Plaintiff's records to Doctor Jeffrey Caren.

Doctor Caren prepared his report on February 12, 2007. He noted that on February 10, 2006, an adenosine myocardial perfusion study was normal and that there was normal regional wall motion in all segments, and he concluded from this that there was no work impairment from coronary artery disease. (DE 14-10 at 18.) As for the Plaintiff's type-two diabetes, her blood sugar levels had been normal and an HgA1C was normal, so he concluded there was no impairment from diabetes. (*Id.*) In evaluating the Plaintiff's multiple joint complaints, he concluded that her symptoms and tests were consistent with "very mild" carpal tunnel syndrome. (*Id.*) He noted that fibromyalgia is a condition that is impossible to objectively quantify, and he agreed with the medical/vocational review that sedentary restrictions and limitations were appropriate based on the Plaintiff's subjective complaints. (*Id.*)

Doctor Caren recognized that Doctor Farnsworth wrote a letter to the Plaintiff on January 8, 2007, indicating that the Plaintiff's carpal tunnel syndrome was work incapacitating on the basis of reduced grip strength and interosseous wasting, but Doctor Caren concluded that the medical records generated by Doctor Farnsworth did not support the conclusion that the Plaintiff's medical problems were work incapacitating. (*Id.*)

Doctor Caren also noted that there were no records documenting current depression or associated treatment, (*id.*) that the Plaintiff's hypertension had been controlled with two medications, that her monoclonal gammopathy was a benign condition, and that her recovery time for her cystic renal cell carcinoma was between four and twelve weeks. (*Id.* at 19.) From all this, Doctor Caren concluded that "from 7/5/06 through October 2006, the restrictions and limitations are light work. From October 2006 through January 2007, the temporary restrictions and limitations are less than light work." (*Id.*)

After reviewing the Plaintiff's medical records and Doctor Caren's report, Defendant Reliance Standard's Quality Review United concluded:

> When we consider all of the medical evidence in the claim file, as documented in part in the body of this letter, in our assessment of your eligibility for continued disability benefits we find that the information, since at least 7/06, does not substantiate a physical or mental condition that was at a level of severity, which would have precluded you from performing the Full-time material duties of at least any sedentary occupation (alternative occupations as discussed in the REA noted in the Claim Department's correspondence dated 7/10/06). Consequently, as a result of this review, we agree with the Claims Department[']s decision in that you are not entitled to LTD benefits beyond 7/5/06."

(DE 14-2 at 11.)

## ANALYSIS

The parties agree that the policy gives Defendant Reliance Standard discretionary

11

authority to determine benefits eligibility. "In ERISA cases, if the plan grants to its administrator the discretion to construe the plan's terms, then the district court must review a denial of benefits deferentially, asking only whether the plan's decision was arbitrary or capricious." *Hess v. Reg-Ellen Mach. Tool Corp. Employee Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007).

> Under this highly deferential arbitrary and capricious standard, "the administrator's decision will only be overturned if it is downright unreasonable. Despite the deferential nature of this standard however, it is not a rubber stamp and a denial of benefits will not be upheld when there is an absence of reasoning in the record to support it. Therefore, this court will uphold the Plan's determination as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.

*Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321–22 (7th Cir. 2007) (citations and quotation marks omitted).

When an entity that administers a benefits plan, such as an employer or an insurance company, both pays benefits out of its own pocket and determines eligibility, the dual role creates a conflict of interest, and a reviewing court must consider that as a factor in determining whether the plan administrator abused his or her discretion in denying benefits. *See Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008). "[T]he significance of the factor will depend on the circumstances of the particular case." *Id.*

> The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to a vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* at 2351 (citation omitted).

Here there is sufficient evidence to support the administrator's decision to deny benefits to the Plaintiff, and the Court therefore cannot say that the decision was "downright unreasonable." Perhaps most importantly, Doctor Garrido, who examined the Plaintiff in person, determined on December 29, 2004, that while the Plaintiff was unable to perform the "light" duties of her regular occupation, she was able to engage in "sedentary" work. (DE 14-20 at 3–6.) On April 8, 2005, Doctor Garrido examined the Plaintiff again, and again he determined that she was capable of sedentary activity. (DE 14-19 at 23.) Given Doctor Garrido's conclusion that the Plaintiff was capable of sedentary work, a vocational analysis in February 21, 2005, determined that in light of the Plaintiff's vocational history, transferable skills and abilities, and residual work capacity, occupational alternatives available to her included positions as a denture waxer, glass grinder, solderer, lock assembler, and optical goods driller. (DE 14-8 at 5.) Since the Plaintiff was able to perform the material duties of these alternative occupations, she was no longer disabled after July 5, 2006.

There is also evidence in the record that the administrator seems to have interpreted, reasonably so, as reflecting some of the Plaintiff's physicians' skepticism towards her descriptions of her symptoms. Doctor Eric Schreier wrote a follow-up letter on August 24, 2004, to Doctors Alan Sidel and William Young in which he wrote: "She reports most of her symptoms occur while standing and walking though she does state that she has symptoms also while sitting down *though this is somewhat less clear*." (DE 14-26 at 24) (emphasis added.) Doctor Garrido wrote in his records on August 4, 2004, that the Plaintiff was

> [complaining] still of chronic back pain. She has been crying and having a lot of
> pain. She has been evaluated by Doctor Kaplansky who thinks it is not really a back

13

problem. She has also been evaluated by Dr. Smith, the [rheumatologist] who doesn't think there is anything rheumatological. She was also seen by Dr. Vallion who [remarked] that the dermopathy is probably not really that severe in not giving her this kind of pain so she was [referred] to Dr. Csickso who doesn't think this is vascular. . . . Chronic back pain, *I think this could be on the realm of psychological*.

(DE 14-25 at 15) (emphasis added.)

The Plaintiff criticizes Defendant Reliance Standard's use of this information on three grounds. First, the Plaintiff believes the information was stale by July 14, 2006, when Defendant Reliance Standard determined that the Plaintiff was ineligible for further benefits. Second, she argues that even if she was capable of sedentary work, she still may have been totally disabled. Third, she says the occupational alternatives listed in the vocational analysis are "almost laughable." (Pl. Resp. to Mot. for Summ. J. 3, DE 15.)

While Doctor Garrido's determination that the Plaintiff could engage in sedentary activity was approximately fifteen months old, and the vocational analysis was approximately seventeen months old, the Plaintiff's condition had not significantly worsened between the time of those evaluations and July 2006, when Defendant Reliance Standard terminated the Plaintiff's benefits. The Plaintiff was complaining of the same symptoms in April 2005 as she was in July 2006. The use of this information therefore does not render the administrator's decision arbitrary or capricious. The Plaintiff points to Doctor Farnsworth's January 8, 2007, letter as evidence that her condition worsened since he diagnosed her with fibromyalgia and peripheral neuropathy. Even if these diagnoses were new, which is not clear, that does not mean the Plaintiff's condition had worsened or would have altered Doctor Garrido's conclusion that the Plaintiff was capable of sedentary activity, since he had noted prior to making that determination that there was a "fibromyalgia component" to the Plaintiff's condition. Furthermore, Defendant Reliance

14

Standard reasonably relied on the conclusion of an independent reviewing physician, Doctor Caren, that while Doctor Farnsworth diagnosed the Plaintiff with fibromyalgia, there is insufficient record support for his conclusion that her condition precludes sedentary work.

The Plaintiff argues that being able to perform sedentary work does not mean that the Plaintiff is no longer entitled to disability benefits. The policy states the opposite. After twenty-four months, an insured is no longer totally disabled if she can perform "the material duties of *any occupation*." (DE 14-7 at 12) (emphasis added.) If an insured can perform the material duties of a sedentary occupation, then she is no longer totally disabled after twenty-four months.

The policy defines "any occupation" as "one that the Insured's education, training or experience will reasonably allow." (*Id.*) The Plaintiff argues that the occupations identified by the vocational analysis are almost laughable and that her education, training, and experience do not allow sedentary work because none of her prior jobs have been sedentary in nature. As for the occupations listed in the vocational analysis, if they are indeed laughable, the Court missed the joke. It also makes no sense to say that one lacks the education, training, and experience for sedentary work in general. Everyone who has ever had a job (and even almost everyone who has not) has the education, training, and experience to know how to exert up to ten pounds of force, to lift carry, push, pull or otherwise move objects, to sit most of the time, and to walk or stand for brief periods of time. *See* "Sedentary Work," *Dictionary of Occupational Titles* (4th ed. 1991), *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (listing Department of Labor's definition of sedentary work). The Plaintiff may also believe she lacks the education, training, and experience for a particular sedentary occupation, but she has not made that argument and designated supporting evidence.

15

Defendant Reliance Standard's consideration of an independent examination by Doctor Caren also demonstrates that its decision was not arbitrary or capricious. The administrator reviewed Doctor Farnsworth's analysis, upon which the Plaintiff heavily relies, but agreed instead with Doctor Caren's conclusions. Doctor Caren noted that while Doctor Farnsworth wrote in his letter to the Plaintiff that her carpal tunnel syndrome was work incapacitating, the medical records do not support such a conclusion. (DE 14-10 at 18.) Rather, Doctor Farnsworth's notes merely state "weakness in hands." (*Id.* at 43.) Doctor Stevens reviewed the nerve conduction studies and concluded that the evidence was only "suggestive of a very mild carpal tunnel syndrome." (DE 14-11 at 20.) Doctor Caren also noted that Doctor Farnsworth's presumptive diagnosis was fibromyalgia, but that fibromyalgia is a condition impossible to objectively quantify.

Doctor Garrido concluded that the Plaintiff was capable of sedentary work after personally examining her on multiple occasions and recognizing that her condition had a fibromyalgia component. Doctor Caren performed an independent record review, and, relying in part on Doctor Garrido's analysis, concluded that from July 5, 2006 through October 2006, the Plaintiff was only restricted to "light work," and to limitations less than light work between October 2006 and January 2007, when she was recovering from an operation. That means the Plaintiff was not totally disabled under the policy as of July 5, 2006.

Defendant Reliance Standard had to choose between conflicting doctors' opinions. It was not arbitrary or capricious to credit Doctor Caren's opinion over that of Doctor Farnsworth. Plan administrators particularly have leeway to choose which doctor's opinion to credit when dealing with fibromyalgia, since its causes are unknown, there is no cure, and its symptoms are entirely

subjective. *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007) (quoting *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003)). "Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)." *See Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004).

While Doctor Farnsworth's records state his opinion that the Plaintiff suffers from fibromyalgia and carpal tunnel syndrome, they do not demonstrate the basis for his conclusion that those conditions preclude even sedentary work. There is nothing inherently wrong with this, but Defendant Reliance Standard is not required to credit a conclusion that the Plaintiff is unable to work (not just that she is diagnosed with a particular medical problem) without supporting evidence or a developed explanation over the contrary conclusions of other doctors. While some people may have such a severe case of fibromyalgia as to be totally disabled from working, most do not. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003). The rule of thumb is that if a patient has tender spots in at least eleven of eighteen fixed locations on the body, he or she will be diagnosed with fibromyalgia. *Id.* Doctor Farnsworth's records do not indicate how many tender spots he found on the Plaintiff, or why he thinks the Plaintiff is in the minority of those with fibromyalgia who are totally disabled from the condition.

The Plaintiff asserts essentially five arguments in support of her contention that Defendant Reliance Standard's use of Doctor Caren's report was arbitrary or capricious. First, she says that the records that Doctor Caren and Defendant Reliance Standard reviewed contained

no proof that her condition had improved since November 17, 2004, the date when Defendant Reliance Standard decided that the Plaintiff was eligible for disability benefits. Second, she says Doctor Caren's report was manufactured to support a predetermined conclusion. Third, she says that Doctor Caren's evaluation is necessarily inferior to Doctor Farnsworth's because Doctor Caren's evaluation was based on a review of records while Doctor Farnsworth's conclusions were based on in-person evaluations of the Plaintiff. Fourth, she says that Doctor Caren and Defendant Reliance Standard ignored the Social Security Administration's finding that the Plaintiff is disabled. And finally, she says that Doctor Caren and Defendant Reliance Standard failed to assess the combination of the Plaintiff's ailments and instead simply evaluated the effects of each diagnosis individually.

The Plaintiff's argument that there was no evidence that her condition improved between Defendant Reliance Standard's November 17, 2004, determination that the Plaintiff was totally disabled and its July 14, 2006, determination that she was not is beside the point. The policy provided that the definition of "totally disabled" would change after twenty-four months from meaning an inability to perform the material duties of the insured's regular occupation to meaning an inability to perform the material duties of *any* occupation. (DE 14-7 at 3.) This means that if an insured is unable to perform the duties of her regular occupation but can perform the duties of another occupation, she will be totally disabled for the first twenty-four months, but not totally disabled thereafter, which is precisely what the Defendants contend is the case here.

The Plaintiff cites cases from the Eighth and Eleventh Circuits supporting the proposition that when a policy administrator decides that a change of circumstances in the insured's condition warrants the termination of benefits, there must be evidence showing that the insured

18

has recovered the ability to perform his or her job. *See McOsker v. Paul Revere Ins. Co.*, 279

F.3d 586 (8th Cir. 2002) (holding that ambiguous statement of psychologist that insured could

return to work but not at pre-disability level of functioning was not enough evidence to reverse

insurance company's previous determination to provide total disability benefits due to severe

depression); *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840–41 (8th Cir. 2001)

(stating that nothing in record supported conclusion that change of circumstances warranted

termination of benefits initially granted for stress-related tachycardia when only change was that

insured resigned from the stressful position that had disabled him); *Levinson v. Reliance*

*Standard Life Ins. Co.*, 245 F.3d 1321, 1327 (11th Cir. 2001) (affirming district court's decision

that denial of benefits was arbitrary and capricious because there was no evidence contradicting

insured's evidence that he was totally disabled). This proposition may be true, but it is irrelevant.

Defendant Reliance Standard did not determine that the Plaintiff's condition changed such that it

no longer met a constant definition. To the contrary, it determined that the Plaintiff's mostly

unchanged condition no longer met a new definition of totally disabled. So even if the Plaintiff is

correct that there was no evidence that her condition improved, the absence of that evidence is

not enough for her to sustain her burden of proving that the denial of benefits was arbitrary or

capricious.

  The Plaintiff next argues that she did not receive a full and fair review of her claim

because Doctor Caren was retained to "manufacture a report stating that Norris is not restricted

from working." (Pl. Br. in Supp. of Summ. J. 9, DE 12.) However, she does not designate any

evidence supporting the claim that the report was "manufactured." Defendants, on the other

hand, designate evidence indicating that Doctor Caren's report reflects an independent analysis.

He is not an employee of either of the Defendants; he is an attending physician at Cedars-Sinai
Medical Center in Los Angeles, California. He was not selected by the Defendants to perform
the review. Rather, Defendant Reliance Standard asked Affiliated Medical Review to find a
doctor to perform a peer review. (DE 14-10 at 22.) Affiliated Medical Review in turn requested
that Doctor Caren review the Plaintiff's records, with his four hundred dollar fee authorized up
front. (*Id.* at 23.)

Contrary to the Plaintiff's assertion that this sort of review is suspect, the Seventh Circuit
has said that "[s]eeking independent expert advice is evidence of a thorough investigation, and
provided that the fiduciary has investigated the expert's qualifications, has provided the expert
with complete and accurate information, and determined that reliance on the expert's advise is
reasonably justified under the circumstances, the fiduciary's decision will be respected . . . ."
*Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998). The Plaintiff takes issue
with Doctor Caren's qualifications, stating that he is a cardiologist and is therefore unqualified to
assess the impact of the Plaintiff's medical condition on her ability to work. But the Plaintiff also
argues that Defendant Reliance Standard should have relied on Doctor Farnsworth's evaluation
instead, and she does not establish the areas in which Doctor Farnsworth specializes. In fact, the
Defendants assert that Doctor Farnsworth himself is a cardiologist. Doctor Caren's letterhead
represents that he is a Qualified Medical Evaluator. (DE 14-10 at 17.) There is no evidence that
Doctor Caren reviewed an incomplete record, is otherwise unqualified to review the Plaintiff's
file, or that Defendant Reliance Standard's reliance on his opinion was unreasonable. His
retention therefore evidences the thoroughness of Defendant Reliance Standard's investigation
into the Plaintiff's eligibility for employment benefits and its efforts to reduce its own potential

20

bias in the evaluation of the Plaintiff's claim. Doctor Caren's independent analysis therefore also offsets the conflict of interest that arises from Defendant Reliance Standard's position as both the arbiter of eligibility and the claim payer in the analysis of whether the eligibility determination was arbitrary or capricious.[2]

The Plaintiff's argument that Doctor Caren's evaluation is necessarily inferior to Doctor Farnsworth's because Doctor Caren's evaluation was based on a review of records while Doctor Farnsworth's conclusions were based on in-person evaluations of the Plaintiff is also to no avail. Doctor Caren based his conclusion that the Plaintiff was capable of sedentary work on the observations of the many doctors who examined the Plaintiff in person. With the exception of Doctor Farnsworth, the Plaintiff does not point to another doctor who concluded that the Plaintiff was incapable of sedentary work. As mentioned earlier, Doctor Garrido twice determined that the Plaintiff was capable of sedentary work after in-person examinations, and Doctor Stevens concluded that the Plaintiff's carpal tunnel syndrome was very mild. Doctor Stevens's examination was subsequent to July 2006 ineligibility determination.

The Plaintiff complains that Doctor Caren's report and Defendant Reliance Standard's letters do not adequately take into account the determination of the Social Security Administration that the Plaintiff is disabled. A plan administrator is not bound by the Social Security Administration's disability benefits determination. *See Anderson v. Operative*

---

[2]  There is also no evidence that Defendant Reliance Standard's administrators have a history of biased claims administration, or that Defendant Reliance Standard has structured the incentives to encourage administrators to deny claims. There are many other factors that minimize any potential effect of the conflict that arises from Defendant Reliance Standard's dual role, including the fact that "most insurers are well diversified, so that the decision in any one case has no perceptible effect on the bottom line," *Leipzig*, 362 F.3d at 409, and the fact that Defendant Reliance Standard is likely aware that both the market and its regulators would punish the company for skewing its processes to deny valid claims.

*Plasterers' and Cement Masons' Int'l Ass'n Local No. 12*, 991 F.2d 356, 358 (7th Cir. 1993). The Social Security Administration's determination is particularly unhelpful when the Social Security file was not before the plan administrator. *See Donato v. Metro. Life Ins. Co.*, 193 F.3d 375, 380 (7th Cir. 1994), *abrogated on other grounds by Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635 (7th Cir. 2005). The Plaintiff only provided Defendant Reliance Standard with the Social Security Administration's ultimate benefits determination, not the Social Security file. The Defendants cannot therefore be faulted for not deferring at all to the Social Security Administration's conclusions.

Finally, the Plaintiff complains that Doctor Caren and Defendant Reliance Standard only considered each of her ailments individually and did not consider whether the combination of medical problems rendered the Plaintiff disabled. Both Defendant Reliance Standard and Doctor Caren stated that they were considering all of the medical records and vocational analyses to determine whether the Plaintiff was disabled as of July 5, 2006. Of course they examined each diagnosis individually first because it is impossible to know the cumulative effect of the Plaintiff's medical problems without first understanding the effects of each ailment individually. The Court does not interpret Defendant Reliance Standard's and Doctor Caren's analyses of the various diagnosis as ignoring the cumulative effects of those diagnoses.

**CONCLUSION**

Defendant Reliance Standard agreed with the Plaintiff from the beginning of her claim process that she was unable to perform the material duties of her regular occupation. Based on

the medical records generated by doctors who examined her, Defendant Reliance Standard also believed from the beginning of the claim processes that the Plaintiff was capable of sedentary work. After twenty-four months, Defendant Reliance Standard's belief as to the Plaintiff's capacity to work did not change, but the definition of total disability did. While her ability to only perform sedentary work rendered her disabled prior to July 5, 2006, it no longer had the same consequence after that date. The Plaintiff's only evidence that Defendant Reliance Standard's benefits determination after July 5, 2006, was arbitrary or capricious is a letter from Doctor Farnsworth in January 2007 that itself does not explain when the Plaintiff's conditions rendered her totally disabled. The Court cannot say that Defendant Reliance Standard's determination that the Plaintiff was ineligible for disability benefits was downright unreasonable. Its decision was therefore not arbitrary or capricious.

**ORDER**

For the foregoing reasons, the Plaintiff's motion for summary judgment (DE 11) is **DENIED**. The Defendants' motion for summary judgment (DE 13) is **GRANTED**.

SO ORDERED on July 28, 2008.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT